IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE                                    :
GREGORY M. ADALIAN                       :    CASE NO.  5-11-04952
          Debtor                         :        CHAPTER  7
                                         :    JUDGE ROBERT N OPEL II
EMERSON M. F. JOU                        :
          Plaintiff                      :
                                         :    ADVERSARY #
          vs.                            :
                                         :
GREGORY M. ADALIAN                       :
          Defendant                      :


**COMPLAINT OBJECTING TO DISCHARGE OF A DEBT UNDER SECTIONS
523(a)(2), (a)(4) & (a)(6) OF THE BANKRUPTCY CODE
and OBJECTING TO DISCHARGE UNDER SECTIONS 727(a)(3), (a)(4) and (a)(5)**

          The Complaint of EMERSON M. F. JOU, by his attorneys, Doran  &
Doran, PC is as follows:

          1.   Plaintiff Emerson  M.F. Jou is a creditor of the Debtor.

          2.   Defendant Gregory M. Adalian is the Debtor in the above bankruptcy case.

          3.   This is a core proceeding under 28 U. S. C. §157(b).

          4.   This is an adversary proceeding objecting to the dischargeability of a debt
and the discharge of the Debtor.


*Background*

          5.   The above matter began with a filing for relief under Chapter 7 of the
Bankruptcy Code on July 15, 2011.  John J. Martin was appointed Chapter 7 Trustee.

          6.   The Defendant had previously filed a Chapter 7 case on February 14,
2011, case # 11-00969, which was dismissed because of failure to file schedules.

          7.   After the above-captioned bankruptcy was filed, and while it was still
pending, the Defendant filed a Chapter 13 proceeding on August 26, 2011, case # 11-
05925.

          8.   The Chapter 13 case was dismissed as a bad faith filing.

1

9.  Plaintiff is a limited partner in SCV Development, a California Limited Partnership ("SCV Development") in which Defendant is the General Partner.

10.  Plaintiff had invested approximately $282,000 in SCV Development.

11.  On March 1, 1991, the Defendant borrowed the sum of $70,000 from Plaintiff and two individuals, as is documented in the Promissory Note attached as *Exhibit 1.* ("1991 Note").   The Plaintiff's share of this note was $50,000.

12.  The funds were loaned to Defendant to allow Defendant to meet the obligations of the partnership.

13.  As stated in the terms of the 1991 Note, as security for the loan, Defendant assigned to the Plaintiff and the two other individuals Defendant's interest in certain vacant land in Pasadena, California and his interest in an "ABS partnership."

14.  On August 3, 1992 Defendant borrowed an additional sum of $50,000 from Plaintiff as is documented in the Promissory Note attached as *Exhibit 2* ("1992 Note").

15.  The  purpose of this loan was also to provide funds so that Defendant could continue to meet the obligations of the partnership.

16.  As security for the 1992 Note, Defendant also assigned to Plaintiff his interest in the Pasadena property, assigned his interest in the ABS Partnership, and also assigned his interest in SCV Development, a California Limited Partnership.

17.  Debtor failed to repay the 1991 Note and 1992 Note.

18.  The vacant land in Pasadena was never quitclaimed as required by the terms of the 1991 Note and 1992 Note, and Defendant claimed he could not recall preparing any documents to perfect the assignments.

19.  Plaintiff subsequently discovered that Defendant had transferred all of his interest in SCV Development to a third party without notifying Plaintiff Dr. Jou, who was protected by a written assignment of those interests and by Defendant's fiduciary obligation  to the limited partner under California law.

20.  Although Debtor borrowed the funds from Plaintiff under the 1991 Note and 1992 Note stating that he money was required to meet obligations of the partnership, Defendant used the funds from the loans for other purposes.

21. On May 19, 2009 Plaintiff filed a civil action against Defendant in the United States District Court for the District of Hawaii, case # 1:09-cv-00226-JMS-KSC for various counts including a money judgment for amounts unpaid on various notes, plus counts for fraud. ("Hawaii Litigation").

## Count I -- Dischargeability under §523(a)(2)

### a. Fraud with respect to original obligations under 1991 Note and 1992 Note

22. Paragraphs 1 through 21 are incorporated by reference as if fully set forth herein.

23. Under §523(a)(2) of the Bankruptcy Code, a Chapter 7 discharge does not discharge a debtor "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by false pretenses, a false representation or actual fraud."

24. Defendant, general partner of SCV Development, induced Plaintiff to lend him money under the 1991 Note and 1992 Note to be used to help Defendant meet the obligations of the partnership.

25. Plaintiff justifiably relied on Defendant's statements that the money loaned would be used for partnership purposes.

26. Defendant did not use the money for SCV Development, which resulted in a financial loss to Plaintiff because Partnership debts, including taxes, were unpaid and the value of Plaintiff's interest in the partnership reduced.

27. As security for the 1991 Note and 1992 Note, Defendant agreed to grant to Plaintiff specific collateral in the form of real estate and an assignment of Defendants interests in two partnerships.

28. The assignments of the real property collateral were never perfected as represented by Defendant and Defendant did not complete the quitclaim of the property interests.

29. The Defendant never quitclaimed the real property as required by the terms of the 1991 Note and 1992 Note.

3

30. Plaintiff justifiably relied on Defendant's statements that he would assign collateral to secure the funds which Plaintiff loaned under the 1991 Note and 1992 Note.

31. When Defendant defaulted on repaying the 1991 Note and 1992 Note, Plaintiff was injured by the Defendant's misrepresentations because the additional collateral to which Plaintiff was entitled, in the form of the quitclaim of the real estate and the assignment of the partnership interests, was not available to apply to the loans to satisfy the obligation.

### b. Fraud Related To Settlement Of Hawaii Litigation

32 . Paragraphs 1 through 31 are incorporated by reference as if fully set forth.

33. In May of 2010, while discovery was pending in the Hawaii Litigation, Defendant contacted Plaintiff representing that he wished to settle the Hawaii Litigation by paying to Plaintiff a total of $180,000 with an initial installment of $25,000 and a balance of $155,000 about four months later.

34. Defendant's attorney had been conferring with Plaintiff's attorney over discovery requests served upon Defendant, but Defendant did not provide the requested documents; instead, on May 28, 2010, Defendant's attorney emailed an offer on behalf of Defendant reiterating the representations of settlement which Mr. Adalian had proposed directly to Plaintiff Dr. Jou.

35. On May 28, 2010, Plaintiff filed a motion to compel production of documents and for sanctions as a result of Defendant's refusal to provide discovery relating to the fraud claim against him.

36. During May of 2010, Mr. Adalian again contacted Dr. Jou directly. He repeated his earlier representations and stated that he wanted to add to his offer a release of possible claims against him based on Dr. Jou's $282,000 investment in the ongoing California Limited Partnership, SCV Development.

37. At the time of the representations made to Plaintiff, Defendant, despite knowing that he had previously assigned his interest in SCV Development to Plaintiff, was attempting secretly to transfer the same interest to a third party in California.

38. On June 3, 2010, Plaintiff's counsel responded with another offer to defense counsel, offering to cap liability with respect to the partnership.

4

39. After discussion, Adalian represented that he would pay $180,000 in two installments. He agreed to cap his liability from the possible partnership claims for $282,000. He further represented that he would pay $25,000 up front on July 6, 2010 and the balance by September 30, 2010.

40. The representation that Defendant would pay the $180,000 to settle the fraud/promissory note case was made falsely with knowledge of its falsity or recklessness as to whether it was true or false.

41. The foregoing representations were made by Defendant with the intent of misleading Plaintiff into relying on them. At all times, Defendant did not, when he made the representation of full payment, intend to pay more then $25,000 to Plaintiff. His true state of mind, regardless of his statements of intention, was not to pay in full.

42. Plaintiff had no practical way, at the time Defendant misrepresented that he would pay in full, to determine that the representations were false.

43. Defendant induced the settlement by representing that he would pay two installments when he only intended to pay the first installment of $25,000. Specifically, Defendant later stated under oath in Doc 30 filed 09/19/11 ¶7 that "had I made the second installment payment of $155,000 Jou may have sued me again…"  Based on this statement, the conclusion is inescapable that Defendant never intended to pay in full at the time he promised payment in full.

44. Defendant induced Plaintiff to settle the litigation, even though Defendant did not intend to pay the settlement and was viewing his default on paying the settlement as a litigation strategy.

45. In June of 2010, just prior to the concluding the settlement agreement, Defendant had liquidated his major individually-owned asset, consisting of real property and fixtures located at 900 Lillibridge Street, Peckville, Blakely Borough, Lackawanna County, PA  ("Peckville Property") for the total sum of $818,900.

46. The Debtor had originally acquired the Peckville Property by deed recorded May 17, 2006.

47. The Debtor sold the Peckville Property by deed dated June 7, 2010, and recorded in Lackawanna County on June 22, 2010.

5

48. On June 21, 2010, the District Court held a conference with the parties at which time a settlement was announced, although the terms were not put on record. On June 28, 2010, the District Court approved the settlement on the record, and on July 6, 2010, the settlement agreement was signed by counsel for the parties.

49. According to the settlement statement for the closing on the Peckville property, the Debtor paid various expenses at closing along with repayment of a first mortgage of $500,000 to "Jeff A. McDaniel" and the Debtor received net proceeds of $302,262.51.

50. When Defendant sought to settle the Hawaii litigation, Defendant did not inform Plaintiff that Defendant was disposing of the Peckville Property or that the Defendant had netted in excess of $300,000 from the sale.

51. In addition to liquidating the Peckville Property with quiet speed, Defendant also concealed from Plaintiff during settlement that he was transferring his interest in the ongoing SCV Development partnership in California to a third party.

52. The Defendant's interest in SCV Development had been previously assigned by Defendant to Plaintiff on August 3, 1992 as collateral for the 1992 Note.

53. Defendant falsely represented in paragraph 16 of the Settlement Agreement that he had the full power, authority, and capacity to execute and perform his obligations under the settlement agreement.

54. The representation in the settlement agreement was false because when Defendant signed the settlement agreement agreeing to pay the sum of $180,000 to Plaintiff, Defendant did not have sufficient assets to pay the settlement payments because he had transferred away the cash proceeds from the sale of the Peckville Property shortly before signing the settlement agreement.

55. When he made the representations, Defendant knew that he did not have sufficient assets to pay the settlement payments because of his recent sale of assets and disbursement of funds to put the funds beyond the reach of the Plaintiff.

56. Defendant's lack of intent to pay the settlement is also confirmed in Defendant's statement under oath that he didn't pay the settlement agreement because he thought it would lead to another lawsuit filed against him.

6

57.  Plaintiff justifiably relied on Defendant's fraudulent misrepresentation that after paying the initial $25,000 settlement installment, Defendant would pay the balance of $155,000.

58.  Plaintiff was harmed by Defendant's false representations that he had the ability and intent to pay the settlement.

59.  Plaintiff relied on the representation of settlement to his detriment by capping the potential claims against Defendant in his fraudulent partnership scheme to $282,000, and by agreeing to a settlement amount for far less than the value of the notes and interest that he was owed thereon.

60.  Plaintiff also relied on the representation of settlement to his detriment because in consideration of the settlement, Plaintiff withdrew his motion to compel production of documents relating to the fraud cause of action, and for sanctions, thus delaying and hampering his ability to uncover Defendant's disposition of assets or obtain a judgment for the amount of the sanctions.

61.  In further reliance on Defendant's representations that he intended to settle the Hawaii litigation, Plaintiff suffered an economic loss in the form of additional fees and costs executing settlement documents and participating in two conferences to place the settlement on the Court record in June of 2010.

62.  By the representation of entering into a settlement that he never intended to pay, Defendant also gained time which he used to spend down what was left from the proceeds of the sale of the  Peckville Property that Defendant had in his possession, thus injuring the Plaintiff's ability to be paid those funds.

63.  The representation that Defendant would pay the second installment after his initial payment was material to the settlement agreement: but for those representations, Plaintiff would not have taken the above actions in reliance thereon

64.  The resulting injuries to Plaintiff were legally and proximately caused to Plaintiff who justifiably relied on Defendant's misrepresentation.

WHEREFORE, the Plaintiff requests that this Court deny the discharge of the debt owed to Plaintiff by Defendant because of the fraud of the Defendant with respect to inducing Plaintiff to loan him funds under the 1991 Note and 1992 Note and the fraud of the Defendant in inducing Plaintiff to settling the Hawaii litigation.

## Count II -- Dischargeability under §523(a)(4)

65.  Paragraphs 1 through 64 are incorporated by reference as if fully set forth herein.

66.  Under Section 523(a)(4) of the Bankruptcy Code, a Chapter 7 discharge does not discharge a debtor "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny".

67.  Defendant, as general partner in SCV Development is a fiduciary to Plaintiff, a limited partner, pursuant to California law.

68.  Defendant fiduciary borrowed money from Plaintiff under the 1991 Note and 1992 Note for the specific purpose of meeting the obligations of SCV Development.

69.  Defendant failed to use the funds for the obligations of the partnership and instead used them for his personal use and other needs.

70.  Defendant's borrowing of funds from the Plaintiff limited partner for the purpose of paying partnership obligations, and then using the funds for other purposes was a fraud and defalcation while acting in a fiduciary capacity.

71.  In 1991, Defendant assigned his interest in SCV Development to Plaintiff under the terms of the 1991 Note.

72.  Defendant had represented in 1989 that his capital contribution to SCV Development was $1,545.000.

73.  Defendant actions constitute a defalcation on his agreement to assign his partnership interest in SCV Development to Plaintiff when he transferring such partnership interest to a third party in 2010 without notifying or compensating the Plaintiff and concealing the transfer from Plaintiff.

74.  Defendant was entrusted with the funds from the loan represented by the 1991 Note an 1992 Note, the purpose of which were to be used for partnership obligations of SCV Development.

75.  Defendant received the loans from the Plaintiff, but did not use the funds for the partnership obligations of SCV Development.

76.  By diverting the funds entrusted to him to pay partnership obligations of SCV Development and instead converting them to other uses, Defendant embezzled the funds received under the 1991 Note and 1992 Note.

8

77. Plaintiff was harmed by Defendants fiduciary defalcation, fiduciary fraud, and embezzlement, in that the borrowed funds did not go to the payment of the obligations of the partnership SCV Development, and the partnership obligations went unpaid, thus lowering the value of Plaintiff's share in the partnership and threatening the economic viability of the partnership.

78. Plaintiff was also injured because Plaintiff incurred costs and attorney fees as a result of Defendant's fiduciary fraud and defalcation and embezzlement of the amounts loaned under the 1991 Note and 1992 Note.

WHEREFORE, the Plaintiff requests that this Court deny the discharge of Gregory M. Adalian under 523(a)(4) of the Bankruptcy Code for all sums, including costs and attorney fees owed by Debtor to Plaintiff as a result of his fiduciary defalcation, fiduciary fraud, and embezzlement.

## Count III-- Dischargeability under §523(a)(6)

79. Paragraphs 1 through 78 are incorporated by reference as if fully set forth herein.

80. Under §523(a)(6) of the Bankruptcy Code, a Chapter 7 discharge does not discharge a debtor for a debt "for willful and malicious injury by the debtor to another entity or the property of another entity."

81. On September 6, 2006, at a time when the Debtor still owed an obligation to the Plaintiff, Debtor voluntarily signed a mortgage in favor of Jeff A. McDaniel which encumbered Debtor's real property in Peckville, PA as security for a loan in the face amount of $500,000.00 ("McDaniel mortgage").

82. According to the terms of the mortgage, the mortgagor, the Defendant, was not primarily liable for the payment of the secured obligations for which he pledged his property as collateral.

83. More specifically, the mortgage indicated that it secured a note executed by High Sierra Financial Corporation.

84. Exhibit B to the McDaniel mortgage is a "Non-Borrower Mortgage Rider" in which the Defendant waived the right for the mortgagee to seek payment from the actual borrower before being paid from Defendant's collateral.

9

85.  Defendant stated under oath that he did not know who the beneficiary of the loan was and he did not produce any information as to the use of the proceeds from the loan stating that he did not have those documents.

86.  By voluntarily encumbering his property for a $500,000 note executed by a third party and not receiving any apparent benefit, the Defendant injured the Plaintiff by reducing Defendant's assets by $500,000.

87. The Plaintiff was injured financially by the payment of $552,500 to Jeff A. McDaniel from the proceeds from the sale of the Peckville Property, because if Defendant had retained the $552,500 in his possession, Defendant would have had sufficient funds to pay the balance of the $155,000 settlement to Plaintiff.

88. The Debtor received net proceeds of $302,262.51 from the sale of the Peckville Property and deposited the proceeds into his bank account on June 14, 2010.

89.  On June 15, 2010, the Debtor transferred $175,000 from his account to his corporation International Telephone Services, Inc.

90.  On June 23, 2010, the Debtor transferred another $7,000.00 to International Telephone Services, Inc and then made a further payment of $5,000.00 to International Telephone Services, Inc on July 30, 2010.

91. The Debtor testified under oath that International Telephone Services, Inc had been losing money since 2008.

92.  The voluntary transfer of $187,000 from his personal account to his wholly-owned corporation that was losing money caused an injury to the Plaintiff, since the $187,000 was put out of reach of the Plaintiff, and there is no evidence that the funds can be recovered.

93.  The transfer of the $187,000 to International Telephone Services, Inc in June of 2010 created a substantial certainty that Debtor would not have sufficient funds available to pay the Plaintiff.

94.  Debtor's wife purchased a 67 acre parcel of real property in Dalton for the sum of $640,000 in September of 2003, more fully described in Lackawanna County Deed Book 1056 page 449.

95.   There was originally a mortgage in favor of First National Community Bank put on record in September of 2003 against this property to secure a loan of

$322,700, but that mortgage was satisfied and replaced by an Open End mortgage in 2004 to the same bank.

96.   Debtor's wife has only nominal income of a few hundred dollars per month.

97.   Debtor testified that he pays the mortgage, real estate taxes and other expenses connected with his wife's property.

98.   As indicated on Debtor's schedules, Debtor's income is $5000 per month and his wife's income is $300 per month.

99.   As indicated on Debtor's Schedule J, Debtor is paying most of the monthly mortgage payment of $2,535.35 and real estate taxes of $831.42, despite the fact that he does not own the real estate.

100.   A payment of $3,366.77 per month housing expense for a household of two is excessive and unnecessary.

101.   Based on the bank statements obtained in connection with the 2004 exam, from January 2010 to the date of the bankruptcy filing, the Debtor transferred at least $46,116.90 to pay the loan payments for the mortgage on his spouse's property and  $3,939.17 to pay real estate tax.

102.   The voluntary transfers of funds by the Debtor to pay the mortgage and taxes and other expenses that arise with respect to his spouse's 67 acre parcel of property  are fraudulent conveyances and are injuring the Plaintiff by depleting the Debtor's assets and creating the substantial certainty that those funds would not be available to pay the Defendants obligations to Plaintiff.

103.   The Debtor owned 60,000 shares of stock in a company known as Hessgen CDA, which he valued at $157,000 in a sworn declaration docketed on 12-2-10 in the Hawaii Litigation.

104.   The Debtor voluntarily sold the stock in February 2011 for approximately $16,000, despite a letter from his sales broker on January 31, 2011 that advised him that a quick sale would bring a very low price.

105.   By disposing of the assets against the advice of his broker, the Debtor injured the Plaintiff by causing a loss of assets.

106. By ignoring the advice of his broker, the Debtor acted with substantial certainty that the sale of the stock would injure the Plaintiff by resulting in a loss of funds.

107. During 2009 and 2010, when Adalian owed an obligation to Plaintiff, Defendant voluntarily transferred to a third party, the same partnership interest that he assigned to Plaintiff under the terms of the 1991 Note and 1992 Note.

108. Prior to the assignment of the partnership interest to Plaintiff, the Defendant had represented in a partnership agreement to Plaintiff and others that his interest was worth $1,545,000.00.

109. By voluntarily transferring the partnership interest to a third party instead of transferring the interest to Plaintiff in respect of the assignment, the Plaintiff was injured by the loss of assets.

WHEREFORE, the Plaintiff requests that this Court deny Court deny the discharge under §523(a)(6) of the Bankruptcy Code for all debts which the Debtor owes to Plaintiff.

### Count IV-- Discharge under §727(a)(3)

110. Paragraphs 1 through 109 are incorporated by reference as if fully set forth herein.

111. Under §727(a)(3) of the Bankruptcy Code, a debtor may be denied a Chapter 7 discharge if

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the Debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

112. The Debtor did not keep adequate records of his financial condition or business transactions.

113. The Defendant has testified that he has not filed individual federal income tax returns since the year 2000.

114.  The Defendant has testified that he has not filed individual state income tax returns since the year 2000 with any state where he had a residence or was otherwise required to file tax returns.

115.  The Defendant testified that he never filed any corporate tax returns for his wholly-owned corporation "International Telephone Services, Inc".

116.  International Telephone Services, Inc was incorporated in Nevada on September 25, 2002 and the Defendant testified that it is his primary source of income.

117.  The failure to file personal or corporate income tax returns makes it impossible for creditors to determine the Defendant's financial condition or business transactions.

118.  Plaintiff sought discovery from Defendant in the course of the Hawaii Litigation, but Defendant refused to provide most of the discovery requested.

119.  Plaintiff conducted an examination of the Debtor under Rule 2004 in the course of the present bankruptcy case on September 1, 2011.

120.  In connection with the Rule 2004 examination, Plaintiff sent to Debtor a request for production of documents ("Request for Production").

121.  The Debtor provided a response to the Request for Production which stated that he does not have the majority of the requested records.

122.  The missing records make it impossible to determine the Defendant's financial condition or business transactions.

123.  Under examination pursuant to Rule 2004, Defendant testified that he had received a note assigned to him payable in the amount of $95,000, but he was unable to recall who had owed him money for which the note was assigned and he testified that he had no record of the transaction.

124.  The Debtor was never paid on the $95,000 note.

125.  Since the $95,000 note was not paid, the obligation might exist as an asset to the estate, but without records of the transaction, it is not possible to determine the status of that note.

126.  The Debtor is the general partner in a California Limited Partnership known as SCV Development, but testified he has no records related to SCV Development except for a single K-1 form.

127.  SCV Development is the partnership which the Plaintiff invested in as a limited partner; there were in excess of 20 limited partners in the entity and in the K-1, Defendant valued his interest partnership interest as worth $1,545,000.00.

128.  Debtor was required to maintain complete information and to provide information to Plaintiff pursuant to California law.

129.  Despite the requirements of California law and a written demand by Plaintiff dated March 19, 2009 asking for the information, Defendant refused and still refuses to provide records or access to records of SCV Development, LLC.

130.  Although the Defendant was the general partner in SCV Development, in response to a request for production of documents evidencing the Defendant's contribution and percentage of interest in SCV Development or information on loans the Defendant made to SCV Development, or repayments, Defendant stated in the 2004 exam that he did not have the documents requested.

131.  The Defendant also stated that he had no documents showing the money he received from SCV Development, from 2001 to date.

132.  Although the Defendant is the 100% owner of International Telephone Services, Inc and that is the sole source of his income, the Defendant testified that he didn't know who International Telephone Service, Inc owed money to or what income International Telephone Service, Inc has.

133.  The Defendant  further testified that he employs a bookkeeper to keep the books and she works under his direction, but that he never looks at the books.

134.  The Defendant testified that he previously owned several parcels of residential and commercial real property in California, but he has no records of the sales of those properties.

135.  Under oath at the 2004 examination, the Defendant was unable to give an account of who he owed money to.

136.  Defendant's response to a request for production of "documents evidencing all debts owed to you" in connection was simply "Debtor does not have the documents requested."

137.  The Defendant testified that he owned stock in US Dataworks and later sold it, but he did not know the percentage or number of shares that he had owned, and did not know when he sold it or how much money he received.

138.  Defendant had purchased property in Dickson City, PA for the sum of $265,000, as more fully described in Lackawanna County Instrument #200437199, recorded on October 5, 2004.

139.  The Defendant sold the same real property in Dickson City, PA to Ronald & Dorothy Kolsoozian, his brother and sister in law, for $200,000 by deed recorded May 15, 2006, Lackawanna County Instrument #200612807.

140.  The Defendant has no records of the sale except for a closing statement and has no records of the disposition of the net proceeds of $199,995.07 paid to him.

141.  The Defendant stated that he did not have an appraisal and did not produce any evidence that the property was listed for sale.

142.  The property was sold to insiders at a loss.

143.  The Defendant still uses the Dickson City property for his corporation, International Telephone Services, Inc but states that there is no rent currently paid.  The Defendant says that rent is due in the future, but did not know the amount and he does not have a copy of any rental agreement.

144.  In the Request for Production, Plaintiff requested various documents concerning the Dickson City property and the Defendant did not provide any listing agreement, proof of source of the funds used to purchase the property, proof of receipt of funds from the purchase, or proof of disbursement of the proceeds of sale.

145.  In May of 2006, the Defendant purchased real property located at 900 Lillibridge St, Peckville, Blakely Borough, PA for the sum of  $620,000.00.

146.  In June of 2010, the Defendant sold real estate and fixtures in Peckville, PA for total consideration of $818,900.

147.  The Defendant paid at closing on June 9, 2010, the sum of $500,000 to satisfy a mortgage to Jeff McDaniel, and shortly after closing the Defendant made an additional payment of $52,500.00 to Jeff McDaniel which the Defendant said represented interest due on the loan.

148.  The mortgage contains a statement that the Defendant was not obligated on the $500,000 loan.

149.  Plaintiff had requested in its Request for Production related to the 2004 exam, a copy of the loan settlement documents, the note, proof of receipt of the loan proceeds, proof of distribution of the loan proceeds, but Defendant's response was that "Debtor does not have the documents requested."

150.  The Defendant stated that he did not have any statement to support the payment of the $52,500 interest.

151.  Without knowing the nature of the transaction that resulted in a depletion of $552,500 from the Defendant's estate in slightly more than a year before his bankruptcy was filed, the Plaintiff cannot determine the financial condition or business transactions of the Debtor.

152.  The lack of these documents related to the loan and McDaniel mortgage also makes it impossible to determine if the Defendant can look to the actual beneficiary of the $500,000 loan or any third party for contribution as a result of Defendant's repayment of the loan of $552,500.00, for which he was not obligated on, from his individual assets.

153.  The Defendant transferred $182,000.00 of the net proceeds from the Peckville sale to his corporation International Telephone Solutions, Inc in three installments and the memo portion of each check described the transfer as "loan".

154.  The Defendant testified that he has nothing in writing regarding these loans to International Telephone Services, Inc.

155.  The Defendant testified that the funds transferred into International Telephone Solutions, Inc were used to pay various parties, but the Defendant stated that there was nothing in writing documenting the obligations for which the payments were made.

156.  The Defendant testified that he did not know if he had any personal liability with respect to those payments in excess of $150,000 made by International Telephone Solutions, Inc, and did not know if any liabilities that were paid were owed by him individually or his corporation.

157.  The lack of documentation for the transfer or disposition of $182,000 which the Debtor transferred to International Telephone Solutions, makes it impossible to determine the financial condition or business transactions of the Debtor, since it is not possible to determine if the transfers were fraudulent conveyances or if the transfers result in an obligation of third parties in the form of rights of contribution.

158.  In response to Plaintiff's request for production of documents, the Defendant stated that he "does not have any documents" related to payments paid to him by International Telephone Solutions, Inc from 2001 to date.

159.  The Defendant testified that he has no record of what International Telephone Solutions, Inc owes him.

160. Defendant has received and repaid several loans to an independent contractor in excess of $5000 each but has no records of any of those transactions.

161.  The Defendant has stated that he has no documents showing his payments of obligations related to his spouse's 67-acre parcel of property.

162.  The Defendant stated that he has no documents showing transfers he made in excess of $10,000 from March 1 2007 to date.

WHEREFORE, the Plaintiff requests that this Court deny the discharge of the Defendant under §727(a)(3) of the Bankruptcy Code.

## Count V – Discharge under §727(a)(4)

163.  Pargraphs 1 through 162 are incorporated as if fully set forth.

164.  Under §727(a)(4) a debtor is denied a discharge if "the debtor knowingly and fraudulently, in or in connection with this case –(A) made a false oath or account.. . (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act".

165.  On September 13, 2011, the Defendant filed Schedules in the bankruptcy case.

166.  On Schedule E of his bankruptcy schedules, the Defendant indicated that every tax entity is owed the sum of $1.00.

167.  The Defendant subsequently testified that the claims filed against him were all in amounts in excess of $1.00.

17

168.  The Defendant did not include the loan receivable from his company International Telephone Services, Inc on his schedule B, despite the fact that he loaned the sum of $175,000 to that company on June 15, 2010, $7,000 on July 23, 2010, and $5,000 on July 30, 2010 and has produced no evidence that the loan was repaid.

169.  Defendant failed to disclose his interest in SCV Development on question 18 of the statement of financial affairs.

170.  Defendant answers question 19b in the statement of financial affairs as "none" even though Debtor testified that an accountant had prepared a financial statement which he submitted to the District Court.

171.  The Defendant made a false oath when he signed a declaration attesting to the accuracy of his schedules.

172.  After his meeting of creditors, the Defendant filed an amendment to Schedule F to add as a creditor SCV Development for a contingent, unliquidated and disputed claim of $307,000.00, without explanation as to why the Debtor General Partner owes the General partnership such sum of money.

173.  If the Defendant has made any false oaths in connection with his 2004 examination or answer to the request for production of documents, or other matters, which come to light in the course of this adversary, the Defendant's discharge should be denied based on such false oaths.

WHEREFORE, the Plaintiff requests that the Discharge of the Defendant be denied under §727(a)(4).

## Count VI-- Discharge under §727(a)(5)

174.  Paragraphs 1 through 173 are incorporated by reference as if fully set forth herein.

175.  Under §727(a)(5) of the Bankruptcy Code, a Debtor may be denied a Chapter 7 discharge if the Debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the Debtor's liabilities.

176.  On September 6, 2006, the Defendant signed a mortgage in favor of Jeff A. McDaniel in the face amount of $500,000.00.

177.  The mortgage states that the Defendant was not the obligor on the $500,000.00 loan.

178.  The Defendant could not explain by whom or for what purpose the $500,000 was used and the Defendant had no copy of a note with respect to the $500,000, so there is no way to explain what liability other parties might have to repay the loan.

179.  The Defendant repaid the entire loan of the $500,000 plus interest to Jeff A. McDaniel in June of 2010, and without a copy of the note, there is no way to determine what rights of contribution the Defendant may have against other parties.

180.  On June 15, 2010, the Debtor made a loans in the amount of $175,000 to his wholly-owned corporation, International Telephone Services, Inc, followed by a second loan of $7,000.00 on June 23, 2010 and third loan of $5,000.00 on July 30, 2010.

181.  The Debtor could not explain the disposition of the funds transferred to International Telephone Services, Inc or why International Telephone Services, Inc is not obligated to repay the funds to the Debtor.

182.  Defendant testified that he had received a note assigned to him payable in the amount of $95,000, but he was unable to recall who had owed him money for which the note was assigned and he testified that he had no record of the transaction.

183.  The Debtor cannot explain why this $95,000 asset was not collected or why it cannot be collected for the benefit of creditors.


WHEREFORE, the Plaintiff requests that this Court deny the discharge of the Debtor under §727(a)(5) of the Bankruptcy Code.


DORAN & DORAN, PC

BY:_____/s/ Lisa M Doran_____
     LISA M. DORAN, ESQUIRE
     Attorneys for Plaintiff
     69 Public Square, Suite 700
     Wilkes-Barre, PA 18701
Dated:  November 1, 2011          570-823-9111     fax 570-829-32-22

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : |
| GREGORY M. ADALIAN | : CASE NO. 5-11-04952 |
| Debtor | : CHAPTER 7 |
| | : JUDGE ROBERT N OPEL II |
| EMERSON M. F. JOU | : |
| Plaintiff | : |
| | : |
| vs. | : |
| | : |
| GREGORY M. ADALIAN | : |
| Defendant | : |

**ORDER DENYING DISCHARGE OF A DEBT**
**UNDER SECTIONS 523(a)(2), (a)(4) & (a)(6) OF THE BANKRUPTCY CODE and**
**DENYING DEBTOR'S DISCHARGE UNDER SECTIONS 727(a)(3), (a)(4) and (a)(5)**

Upon Complaint of the above Plaintiff, requesting that the Debtor's discharge under Chapter 7 be denied and also that the discharge of all debts owed by Defendant to the Plaintiff be denied, it is

ORDERED that Gregory M. Adalian, Defendant is denied a Chapter 7 discharge pursuant to sections 727(a)(3) (a)(4) and (a)(5) of the Bankruptcy Code; and it is

FURTHER ORDERED that any and all debts owed by Gregory M. Adalian, Defendant to Plaintiff are nondischargeable pursuant to sections 523(a)(2), (a)(3), and (a)(6) of the Bankruptcy Code.